FILED _____ ENTERED
_____ LODGED _____ RECEIVED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NOV 22 2016

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) **STATE OF MARYLAND,** ) **DISTRICT OF COLUMBIA,** *ex rel.,* ) ) **STEVEN PRINGLE** ) **480 Web Foot Lane** ) **Stevensville, MD 21666** ) )     **Plaintiff-Relators,** ) ) **BRINGING THIS ACTION ON BEHALF** ) **OF THEMSELVES AND THE UNITED** ) **STATES OF AMERICA, THE STATE OF** ) **MARYLAND, AND THE DISTRICT OF** ) **COLUMBIA,** ) ) **c/o** ) **ATTORNEY GENERAL OF THE UNITED** ) **STATES** ) **U.S. Department of Justice** ) **950 Pennsylvania Ave, N.W.** ) **Washington, DC 20530** ) ) **ATTORNEY GENERAL FOR THE STATE** ) **OF MARYLAND** ) **200 St. Paul Place** ) **Baltimore, MD 21022** ) ) **ATTORNEY GENERAL FOR THE** ) **DISTRICT OF COLUMBIA** ) **441 4th Street NW, Suite 1060 N** ) **Washington, DC 20001** ) )     **Plaintiffs,** ) ) **v.** ) ) **DR. MUBASHAR CHOUDRY** ) **7610 Carroll Ave, Suite 100,** ) **Takoma Park, MD 20912** ) ) ) ) | **CIVIL ACTION NO:** _____ <br><br> **COMPLAINT**  GJH 16 CV3779 <br><br> **FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

**JAVED CHOUDRY**
**7610 Carroll Ave, Suite 100,**
**Takoma Park, MD 20912**

**DR. MOHSIN IJAZ**
**7610 Carroll Ave, Suite 100,**
**Takoma Park, MD 20912**

**WASHINGTON CARDIOVASCULAR**
**INSTITUTE**
**7610 Carroll Ave, Suite 100,**
**Takoma Park, MD 20912**

**WASHINGTON VASCULAR INSTITUTE**
**7610 Carroll Ave, Suite 100,**
**Takoma Park, MD 20912**

**ADVANCED CARDIOLOGY CARE**
**7610 Carroll Ave, Suite 102,**
**Takoma Park, MD 20912**

**ADVANCED VASCULAR RESOURCES**
**7610 Carroll Ave, Suite 100,**
**Takoma Park, MD 20912,**

  **Defendants.**

  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................................1

JURISDICTION AND VENUE...........................................................................................................3

PARTIES..............................................................................................................................................4

RELEVANT LAWS AND REGULATIONS.......................................................................................6

    I.     The False Claims Act...............................................................................................6

    II.    Government Health Care Programs...........................................................................7

        A.    The Medicare Program.......................................................................................7

        B.    Medicaid ..........................................................................................................10

        C.    TRICARE .........................................................................................................11

    III.   Medicare Claim Submission and Payment Process .................................................12

    IV.   THE MEDICARE COPAYMENT .........................................................................13

    V.    THE ANTI-KICKBACK STATUTE AND STARK LAW.................................16

    VI.   PERIPHERAL ARTERY DISEASE .....................................................................18

        A.    Treatment for PAD ..........................................................................................19

        B.    The Medicare Benefit for PAD ........................................................................21

FACTUAL ALLEGATIONS ...........................................................................................................25

    VII.  DEFENDANTS SUBMITTED FALSE CLAIMS FOR EXCESSIVE, MEDICALLY UNNECESSARY, AND/OR INADEQUATELY DOCUMENTED CARDIOVASCULAR PROCEDURES.............................................25

        A.    Failure to Document Medical Necessity..........................................................26

        B.    Excessive and Medically Unnecessary Procedures.........................................29

        C.    Specific Examples of Medically Unnecessary and/or Inadequately Documented Procedures.......................................................................................................32

    VII.  DEFENDANTS KNOWINGLY AND WILLFULLY PAID KICKBACKS AND VIOLATED THE STARK LAW IN THE FORM OF WAIVED MEDICARE COPAYMENTS, FREE TRANSPORTATION, AND FREE ANKLE BRACHIAL INDEX TESTS.................................................................44

    VIII. DAMAGES TO THE UNITED STATES, MARYLAND, AND THE DISTRICT OF COLUMBIA.............................................................................47

COUNT I ...........................................................................................................................................48

COUNT II...........................................................................................................................................50

COUNT III..........................................................................................................................................52

COUNT IV..........................................................................................................................................53

COUNT V...........................................................................................................................................55

COUNT VI ...................................................................................................................................57

COUNT VII..................................................................................................................................58

COUNT VIII ................................................................................................................................60

COUNT IX ...................................................................................................................................62

PRAYER FOR RELIEF................................................................................................................63

PLAINTIFF-RELATOR STEVEN PRINGLE ("Relator") hereby voluntarily discloses substantially all information known to him regarding the knowing violation of the federal False Claims Act and similar state laws by DR. MUBASHAR CHOUDRY, in his personal capacity, JAVED CHOUDRY, in his personal capacity, DR. MOHSIN IJAZ, in his personal capacity, and ADVANCED VASCULAR RESOURCES, and its subsidiaries and precursors, including but not limited to the WASHINGTON CARDIOVASCULAR INSTITUTE and ADVANCED CARDIOLOGY CARE (hereinafter collectively referred to as "Defendants"). Defendants' ongoing illegal actions have defrauded the federal and state governments of tens of millions of dollars and present a serious danger to public health.

## INTRODUCTION

1.   Relator brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and related laws in Maryland, Md. Code Ann. Health-Gen.§§ 2-601 *et seq.*, and the District of Columbia, D.C. Code §§2-381.01 *et seq.*, as amended (collectively the "FCA"), alleging that Defendants knowingly presented false claims, caused others to present false claims, made false statements material to false claims, and/or violated the Stark Law and Anti-Kickback Statute, by fraudulently billing Medicare, state Medicaid, and TRICARE programs (collectively the "Government") for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures.

2.   For at least six years before the filing of this Complaint (the "relevant period"), Defendants engaged in a pattern and practice of performing and billing the Government for an excessive number of invasive procedures to treat peripheral artery disease, including angiographs, angioplasties, atherectomies, and stent implantations. Defendants failed to exhaust non-invasive alternative therapies before performing these expensive and higher-risk procedures,

1

subjecting patients to peripheral artery interventions that were not medically necessary and/or that lacked proper evaluation and documentation of medical necessity.

3.   Most of Defendants' patients are elderly and in poor health.  The unnecessary surgical procedures that Defendants perform constitute a serious danger to public health that subjects this particularly vulnerable population to a variety of dangerous complications, ranging from allergic reactions to the contrast injected into their bloodstreams during the procedures, to potentially fatal embolisms, heart attacks, and strokes due to dislodged plaques moving through the bloodstream.

4.   Defendants knew, deliberately ignored, or recklessly disregarded Medicare and Medicaid payment rules by presenting claims to the Government for procedures that were not indicated by patients' symptoms or medical histories.  Defendants knowingly and falsely certified that each such procedure was medically necessary, thereby defrauding the Government.

5.   To facilitate this fraudulent pattern and practice, and in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), Defendants routinely and indiscriminately waived the 20 percent Medicare beneficiary copayment for cardiovascular procedures, or limited collection to whatever the beneficiary's co-insurance would pay, but billed Medicare for 100 percent of the procedures' cost—knowingly and willfully misrepresenting the actual cost of the procedures and providing financial kickbacks to induce beneficiaries to continue undergoing excessive testing and treatment without questioning the medical necessity of the procedures. Defendants further violated the Anti-Kickback Statute by providing free transportation to and from their facility to patients receiving procedures, ensuring that there is no disincentive to receiving the unnecessary treatments.

6.   Defendants also violated the Stark Law, providing free "ankle-brachial index" tests to the patients of other physicians and allowing those physicians to bill for these procedures, thereby providing remuneration in exchange for referrals. Defendants' ankle-brachial index business also violates the Stark Law as an impermissible self-referral.

7.   By presenting false claims to the Government for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures—and by routinely and indiscriminately waiving Medicare copayments—Defendants obtained tens of millions of dollars to which they were not entitled. Accordingly, Defendants are liable to the Government under the FCA.

## JURISDICTION AND VENUE

8.   This action arises under the federal false claims act, 31 U.S.C. § 3729, et seq. This action also arises under D.C. Code §§2-381.01 *et seq*. and Md. Code Ann. Health-Gen.§§2-601 *et seq*. Except where noted otherwise, these laws are hereinafter collectively referred to as the "False Claims Act."

9.   Subject matter jurisdiction over all federal causes of action is conferred upon this Court by 28 U.S.C. § 1331, in that this action arises under the laws of the United States, by and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

10.  Pendant and supplemental jurisdiction over the claims made under various state laws are conferred by 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b), as these state law claims arose out of the same nucleus of operative facts as, and are related to, Relator's federal claims.

11.  Venue is proper in this Court pursuant to 28 U.S.C § 1391(c) and 31 U.S.C. § 3732(a) as the Court has personal jurisdiction over at least one defendant who can be found in, resides,

transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in this district. At least one defendant also caused false claims to be made or certified in this jurisdiction.

12. There has been no public disclosure of the allegations contained herein. In the event that any unknown disclosure has occurred, Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4).

13. Relator has independent knowledge of all the information contained herein, and voluntarily provided a confidential written disclosure of such information to the United States and the above-listed state governments prior to filing this Complaint.

14. Relator has complied with all conditions precedent to bringing this action.

## PARTIES

15. Relator Steven Pringle has been a nurse since 1997, when he immediately began working in critical care. In 1998, Relator moved to the "cath lab" and began assisting exclusively on interventional cardiovascular procedures, where he became very familiar with the treatment of peripheral artery disease and the surgical techniques described in this Complaint. From 2001-2012, Relator worked as a clinical sales rep promoting different products and consulting in the treatment of peripheral artery disease. Relator began working for Defendants in 2013 as their Vice President of Operations. In this capacity, Relator was able to observe almost every aspect of Defendants' business, though he was not himself involved in the creation or presentation of any of the false claims described herein. Relator was also frequently called upon to oversee or assist in many of the surgical procedures described herein, allowing him to observe Defendants perform unnecessary procedures firsthand. Relator terminated his employment with Defendants in August 2016.

4

16.  Defendant Dr. Mubashar Choudry is the principal and co-owner of Defendants Advanced Vascular Resources, Washington Cardiovascular Institute, Washington Vascular Institute, and Advanced Cardiology Care.  Dr. Choudry personally performed the majority of the unnecessary procedures described herein, personally approved each of the false claims presented to the Government, and is the driving force behind Defendants' fraudulent practices.

17.  Defendant Javed Choudry is Dr. Choudry's brother and Chief Financial Officer of Advanced Vascular Resources.  Mr. Choudry manages the finances of Defendants Advanced Vascular Resources, Washington Cardiovascular Institute, Washington Vascular Institute, and Advanced Cardiology Care, and is personally responsible for preparing many of the false claims described herein.  Mr. Choudry is therefore personally liable as a co-conspirator.

18.  Defendant Dr. Mohsin Ijaz is a principal and co-owner of Defendant Advanced Cardiology Care.  Dr. Ijaz is fully aware of Dr. Choudry's practices and has done nothing to stop it, making him personally liable as a co-conspirator. Dr. Ijaz personally engaged in fraud and furthered the conspiracy by billing Medicare and Medicaid for procedures actually performed by Dr. Choudry.

19.  Defendant Washington Cardiovascular Institute, located at 7610 Carroll Ave, Suite 100, Takoma Park, MD 20912, is the primary corporate entity through which Defendants do business.  Washington Cardiovascular Institute appears on the letterhead of most patient charts and is the entity that presented most of the false claims described herein to the Government.  All of the unnecessary surgical procedures described herein were performed on the premises of Washington Cardiovascular Institute.

20. Defendant Washington Vascular Institute is a group practice formed by Dr. Choudry with offices in Hagerstown, MD and Atlanta, GA. Interventional procedures attributed to Washington Vascular Institute were performed on the premises of Washington Cardiovascular Institute.

21. Defendant Advanced Cardiology Care is a private practice owned and operated by Dr. Choudry and Dr. Mohsin Ijaz, with offices at 11110 Medical Campus Rd Suite 101 Hagerstown, MD, 11119 Rockville Pike, Suite, 100, Rockville, MD 20852, 75 Thomas Johnson Dr, Suite I, Frederick, MD 21702, and 7610 Carroll Ave, Suite 102, Takoma Park, MD 20912. Dr. Choudry performs ultrasounds and office visits with patients through this entity, but refers patients to Washington Cardiovascular Institute for interventional procedures.

22. Defendant Advanced Vascular Resources is the parent company of the Washington Cardiovascular Institute, Washington Vascular Institute, and Advanced Cardiology Care, with offices at 7610 Carroll Ave, Suite 100, Takoma Park, MD 20912. Defendants see at least some patients through this entity, and use its letterhead in many forms of correspondence with patient and referring physicians. While most of the business done by Advanced Vascular Resources occurs in Maryland, it has other offices in Atlanta, GA, Johnstown, PA, and several other locations throughout the United States.

## **RELEVANT LAWS AND REGULATIONS**

### I.    **The False Claims Act**

23. The federal False Claims Act and the related laws of Maryland and the District of Columbia provide that any person or entity that knowingly presents, or causes to be presented, a false claim for payment or approval, a false statement that is material to a claim for payment or

6

approval, or conspiracy to commit any of these acts, is liable to the United States for damages and penalties. *See* 31 U.S.C. § 3729(a)(1); DC Code § 2-381.02; Md. General Provisions Code § 8-102; Md. Health General Code § 2-602.

24. "Knowingly" means that the person or entity: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1); DC Code § 2-381.01; Md. General Provisions Code § 8-101. The person or entity need not have acted with the specific intent to defraud the Government to be liable under the FCA. *Id.*

## II.     GOVERNMENT HEALTH CARE PROGRAMS

25. The FCA imposes liability for knowingly false claims presented to state and federal healthcare programs, such as Medicare, Medicaid, and TRICARE.

### A.     The Medicare Program

26. The Health Insurance for the Aged and Disabled Program, commonly referred to as Medicare, is a public health insurance program established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk-1.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq*.

27. Medicare is comprised of Parts A, B, C, and D.  Part B authorizes payment of federal funds for health services, including physician, laboratory, outpatient, diagnostic, and radiology services. *See* 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.  Part B primarily covers outpatient medical procedures and related services performed by physicians, *i.e.* physician visits and surgical procedures that generally do not require a patient to stay more than 24 hours in a hospital, or that take place at non-hospital facilities such as ambulatory surgical centers.

Medicare Part B also covers prescription drugs and medical devices that are provided/used in connection with covered services.

28. A Medicare beneficiary who receives a covered medical service can either pay for the medical service and request reimbursement of 80% of the reasonable charge or, much more commonly, assign the right to reimbursement to the physician providing the service, who then collects payment as an assignee of the individual under 42 U.S.C. § 1395l(a)(1).

29. The Secretary of HHS has overall responsibility for the administration of Medicare. Within HHS, the responsibility for the administration of Medicare has been delegated to the Centers for Medicare and Medicaid Services ("CMS").

30. To assist in the administration of Medicare Part B, CMS initially contracted with "carriers" or "fiscal intermediaries." Carriers, typically private insurance companies, were largely responsible for processing and paying Part B claims. 42 C.F.R. §§ 421.1–421.3.

31. Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing carriers and fiscal intermediaries. *See* 42 U.S.C. § 1395kk-1; 42 C.F.R. § 421.400 *et seq.*; 71 F.R. 68181 (Nov. 24, 2006). MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. MACs also have authority to issue Local Coverage Determinations ("LCDs"), which define the circumstances under which the MAC will approve a claim for a particular item or service, i.e. the circumstances under which the particular claim is "reasonable and necessary." 42 U.S.C. §§ 1395ff(f)(2)(B), 1395y(a)(1)(A). Compliance with the provisions of a LCD is required for payment.

32. During the relevant period, the MAC for Maryland and the District of Columbia has been Novitas Solutions, Inc., formerly known as Highmark Medicare Services, Inc. ("Novitas").

33. Medicare does not pay for every medical service. The only services that Medicare covers are those that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). For this reason, as a precondition of payment, Medicare providers must certify that their services are rendered "economically and only when, and to the extent, medically necessary" and "of a quality which meets professionally recognized standards of health care." 42 §§ 1320c-5(a)(l), (2).

34. Part B providers make various certifications when they enroll in Medicare and sign CMS Form 855b (Medicare Enrollment Application for clinics/group practices and certain other suppliers) and/or CMS Form 855i (Medicare Enrollment Application for physicians and certain non-physician practitioners), including:

> I agree to abide by the Medicare laws, regulations and program instructions . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
> * * *
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

35. CMS relies on the veracity of these certifications and, based on that reliance, makes Medicare payments retrospectively (*i.e.*, after the services are rendered) to Part B providers. For this reason, Medicare payments are often referred to as reimbursements.

36. During the entire relevant period, Dr. Choudry has been registered as a Medicare provider in Maryland and/or the District of Columbia, and has executed at least one provider enrollment agreement.

37. Defendants and their predecessor organizations have been registered as a Medicare group practice in Maryland for the entire relevant period.

### B.    Medicaid

38. Medicaid is a public health insurance program operated and administered by the various States and overseen by CMS as set forth in Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. Medicaid is funded by State and Federal taxpayer funds. At all times relevant to this Complaint, the Federal government has provided at least 50% of the funding for the Medicaid and District of Columbia Medicare programs.

39. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy. State government entities contract with private companies to offer and administer Medicaid and related plans to beneficiaries pursuant to contracts and applicable laws and regulations.

40. CMS requires each participating state to implement a plan for the enrolling of beneficiaries and minimum criteria for coverage of services and payment of claims. 42 U.S.C. §§ 1396, 1396(a)(13), 1396a(a)(30)(A).

41. By becoming a participating provider in the Medicaid programs of the various States, Defendants agreed to abide by all laws, regulations, and procedures applicable to those programs, including those governing payment and reimbursement for claims.

42. Participation in Medicaid requires meeting all requirements for participation in Medicare. 42 C.F.R. § 482.1(a)(5).

### C.    TRICARE

43.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

44.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

45.    Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

46.    TRICARE's governing regulations, like those of Medicare and Medicaid, are also based upon "medical necessity."    TRICARE requires that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. § 199.6(a)(5). As such, like Medicare and Medicaid, TRICARE does not cover services that exceed medical

necessity. *Id.* Claims for payment for such services constitute fraud under the False Claims Act.

## III.    MEDICARE CLAIM SUBMISSION AND PAYMENT PROCESS

47.  As Medicare providers, Defendants were obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements.

48.  In order to receive payment for covered medical services, Medicare providers must submit a paper or electronic copy of CMS Form 1500 Health Insurance Claim Form.  Providers also use CMS Form 1500 to present claims to Medicaid, TRICARE, and other government-sponsored health insurance programs.

49.  When submitting claims to Medicare or the local MAC on CMS Form 1500, providers make several express certifications, including that: (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) the information on the claim form is "true, accurate and complete;" (c) the provider has "provided or will provide additional information required to allow the government to make an informed eligibility and payment decision;" and (d) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to CMS Form 1500, providers further expressly certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

12

50. By signing CMS Form 1500, providers expressly acknowledge their understanding that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

51. Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

52. Generally, once a provider submits CMS Form 1500 to the Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

53. Exceptions to this general procedure include pre-payment and post-payment reviews, which can be initiated by MACs and other intermediary organizations to address suspect billing practices. In pre-payment review, some or all of a provider's claims undergo medical review before payment is authorized. Medical review involves the collection and evaluation by a medical professional of the medical records associated with each claim. In post-payment review, a sample of paid claims is subjected to medical review to establish whether an underpayment or overpayment occurred in the universe of claims.

## IV.    THE MEDICARE COPAYMENT

54. Under Part B, Medicare generally pays 80 percent of the reasonable charges (as established by the Medicare Physician Fee Schedule) for medically necessary services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1)(A). Medicare beneficiaries are

13

generally expected to pay the remaining 20 percent in the form of a copayment, also called a "copay" or "coinsurance" payment.

55.   The copayment is intended to minimize costs to federal healthcare programs and beneficiaries by incentivizing beneficiaries to be better health care consumers—selecting services because they are medically needed, rather than simply because they are free. *See* HHS Office of Inspector General Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375 (Dec. 19, 1994). Consequently, except in narrow circumstances. federal law prohibits the waiver of copayments. *Id.* (citing 18 U.S.C. §§ 287, 1001; 31 U.S.C. § 3729; 42 C.F.R. §§ 1320a-7, 1320a-7a, 1320a-7b).

56.   The routine waiver of copayments is prohibited because "[a] provider, practitioner or supplier who routinely waives Medicare copayments . . . is misstating its actual charge." For example:

> if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65374–75. As the Medicare Claims Processing Manual (Ch. 23 § 80.8.1) explains:

> Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual" charge for the purpose of processing a claim or for the purpose of determining customary charges.

57.   The routine waiver of copayments may also constitute impermissible remuneration under provisions of the Social Security Act, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a.

58.   As the HHS Office of Inspector General explained:

> In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments . . . could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* Medicare Program Integrity Manual, Ch. 4 § 4.22.1.1 ("Routine waivers of coinsurance or deductibles are unlawful because they could result in . . . violation of the anti-kickback statute.").

59. Similarly, § 1128A(a)(5) of the Social Security Act prohibits the offer or transfer of "remuneration" to a Medicare beneficiary that the offeror or transferor knows or should know is likely to influence the beneficiary's healthcare decisions. 42 U.S.C. § 1320a-7a(a)(5); *see also* OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 30, 2002). Prohibited "remuneration" includes "the waiver of coinsurance and deductible amounts (or any part thereof)." 42 U.S.C. § 1320a-7a(i)(6).

60. Even if non-routine, the waiver of a copayment is permissible only in narrow circumstances. The waiver must be (1) unadvertised, and must either (2) "address the special financial needs of a particular patient" or (3) occur after "a good faith effort to collect" has been exhausted. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* 42 U.S.C. § 1320a-7a(i)(6) (prohibited remuneration does not include "the waiver of coinsurance" if (i) "the waiver is not offered as part of any advertisement or solicitation;" (ii) "the person does not routinely waive coinsurance;" and (iii) the person determined "in good faith that the individual is in financial need" or failed to collect "after making reasonable collection efforts"); 42 C.F.R. § 1003.101 (same).

61.  Copayment waivers are not permissible if they are advertised. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. Advertising includes indirect marketing or promotional efforts, or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups. OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 30, 2002).

62.  A copayment waiver based on financial hardship is prohibited if it is not supported by a "good faith" assessment of the individual beneficiary's financial need, which must be expressly documented in the beneficiary's records.  Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The "[r]outine use of 'Financial hardship' forms which state that the beneficiary is unable to pay the coinsurance" is insufficient. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375.

63.  A copayment waiver based on a failure to collect is prohibited if it is not preceded by a "good faith" collection effort. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The collection effort must be more than "token" and must be similar to efforts made to collect comparable amounts from non-Medicare patients. Medicare Claims Processing Manual, Ch. 23, § 80.8.1.

## V.    THE ANTI-KICKBACK STATUTE AND STARK LAW

64.  The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congress' concern that payments to those who influence healthcare decisions would result in goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect Medicare and Medicaid from these harms, Congress enacted a prohibition against payment of kickbacks in any form. *See* Social Security Amendments of

16

1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

65.  The AKS prohibits any person or entity from knowingly and willfully soliciting or receiving remuneration to induce or reward any person for referring, recommending, or arranging for federally-funded medical services, including services provided under the Medicare and/or Medicaid programs. *See* 42 U.S.C. § 1320a-7b(b).

66.  In 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759, codified at 42 U.S.C. § 1320a-7b(g).

67.  Any person that commits an act described in 42 U.S.C. 8 1320a-7b(b) is also liable for damages of not more than three times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose. 42 U.S.C. 8 1320a-7a(a)(7).

68.  The Stark Law prohibits a physician from making a referral to an entity for the furnishing of health services if the physician has a "financial relationship" with that entity.  42 U.S.C. 8 1395nn(a)(1).  Moreover, "[n]o payment may be made under [Medicare] for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

69.  The Stark Law defines "financial relationship" to include any arrangement involving any remuneration between the entity and physician. 42 U.S.C. 88 1395nn(a)(2)(B) and (h)(1). Likewise, a "referral" includes "the request or establishment of a plan of care by a physician

17

which includes the provision of the designated health service ...." 42 U.S.C. § 1395nn(h)(5)(B).

70. Compliance with the Anti-Kickback Statute and the Stark Law is a precondition to participation as a health care provider under Federal health care programs. Failure to comply with the AKS or Stark Law is a per se violation of the FCA.

## VI. PERIPHERAL ARTERY DISEASE

71. The false claims discussed in this Complaint involve medical services related to the diagnosis and treatment of Peripheral Artery Disease ("PAD"), which is a narrowing or blockage of the major arteries to the limbs (*i.e.* the peripheral arteries) that results in a reduction of blood flow to those limbs.

72. PAD is usually caused by atherosclerosis—the buildup of cholesterol and fatty deposits called "plaques" on the inner walls of the arteries. Plaques restrict blood flow to the limbs and other parts of the body by clogging arteries or causing abnormal artery function. Cardiovascular specialists and other medical professionals refer to this narrowing or blockage as a "lesion" or "stenosis."

73. PAD includes a spectrum of syndromes ranging from intermittent "claudication" to "critical limb ischemia." Claudication is exertional leg pain caused by obstructed arteries. "Critical limb ischemia" usually involves non-exertional or resting leg pain, non-healing wounds, ulcers, or gangrene. Most patients with PAD have only intermittent claudication, which is typically unlikely to progress to critical limb ischemia, and does not require an invasive intervention.

74. PAD that is significant enough to warrant treatment, especially invasive treatment, must be specifically and appropriately evaluated, diagnosed, and managed. Peripheral arteries may be

18

significantly or completely blocked yet not require intervention because more than one artery supplies blood to the peripheral tissue. Accordingly, a provider must evaluate the severity of the PAD and its impact on a patient's symptoms and functionality through non-invasive testing before resorting to invasive procedures.

### A.   Treatment for PAD

75.   Commonly used non-invasive testing for PAD includes physical examination for, among other things, a diminished pulse; a whooshing sound (or "bruit") heard over arteries using a stethoscope; and poor wound healing in areas where blood flow may be restricted. Another technique compares systolic blood pressure in the ankle to systolic blood pressure in the arm, and evaluates the resulting ratio, referred to as the "ankle-brachial index" ("ABI").

76.   Other, more sophisticated non-invasive testing for PAD involves techniques like segmental blood pressure recordings; pulse volume recordings ("PVRs"); blood flow measurements with ultrasound (or "Doppler"); magnetic resonance angiography ("MRA"); and computerized tomography angiography ("CTA"). MRA and CTA involve the injection of contrast material (or "dye") into the blood vessels to enable the cardiovascular specialist to view vascular anatomy without using an invasive catheter-based approach.

77.   Non-invasive treatment for PAD often includes medications such as aspirin, statins (cholesterol-lowering drugs), and cilostazol (the generic name of a drug used to treat claudication); dietary modifications; exercise programs; and risk factor modification, especially smoking cessation.

78.   If non-invasive tests corroborate the severity of the PAD—and if disabling claudication or critical limb ischemia has developed—a physician may perform invasive testing to determine if "revascularization" is necessary. Revascularization refers to the use of invasive techniques,

either catheter-based or surgical, to restore adequate blood flow to the affected limb and relieve symptoms.

79. Catheter-based angiography, or an "angiogram," is an invasive imaging procedure that involves the insertion of a long, narrow tube called a "catheter" into a blood vessel in the arm or leg.  The catheter is guided through the blood vessel to the artery of interest with the aid of an x-ray imaging technique called fluoroscopy.  Dye is injected through the catheter into the vessel to make its internal dimensions visible.

80. If significant stenosis is confirmed by the angiogram, the physician may perform percutaneous transluminal "balloon" angioplasty ("PTA") inside the artery to re-open it and allow blood to flow more freely.  This procedure is performed by administering a blood thinner, then passing a balloon catheter over a guide-wire into a significantly narrowed portion of the artery and inflating it to reduce the severity of the blockage. The balloon catheter and guide-wire are then removed.

81. Another possible invasive, catheter-based treatment is atherectomy, which involves the use of a sharp blade, burr, or laser housed within the catheter to excise or destroy plaques from within an artery.

82. If an angioplasty or atherectomy is not successful (i.e. the artery remains significantly blocked, or shows signs that it will quickly become blocked again), or if the artery is torn or otherwise damaged by the procedure (known as "dissection"), the physician may deploy a "stent."  Stents are small metallic mesh tubes that are placed inside a blocked or narrowed artery to keep the vessel open after it has been dilated or torn.  Stents are used depending on certain features of the clogged vessel, including the extent and location of the blockage.

83.   Angiography, angioplasty, atherectomy, and stent implantation are invasive procedures that usually require conscious sedation and subject patients to some risk of harm.

84.   Any invasive procedure can lead to "restenosis" or re-narrowing due to scar build-up at the site of intervention. The catheter can also tear or rupture blood vessels causing internal bleeding and dislodge plaques from the arterial wall that can travel downstream or "embolize" into the circulation and lead to stroke, heart attack, or poor blood flow to a limb.

85.   The dye injected into the arteries during a catheterization procedure can cause allergic reactions or kidney failure, and the radiation used for imaging can lead to injuries ranging from dermatitis to cancer.

86.   Stents can trap or "jail" other arteries depending on their placement, sometimes permanently blocking other arteries and cutting off important alternative avenues of collateral circulation. Stents can also limit surgical options for revascularization. Excessive stenting can limit the number of viable, un-stented arteries into which a bypass can be connected.

### B.   The Medicare Benefit for PAD

87.   Medicare providers may only bill or receive payment for a peripheral artery angiography, angioplasty, atherectomy, or stent implantation that is "reasonable" and "medically necessary." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(l).

88.   Clinical indications supporting the medical necessity of peripheral artery interventions are published in multiple public sources, including national guidelines issued by industry groups like the American College of Cardiology Foundation and the American Heart Association, and Local Coverage Determinations issued by MACs.

89.   According to the American College of Cardiology Foundation and the American Heart Association, a peripheral artery must usually be at least 50 to 75 percent blocked before it can

be diagnosed as "clinically significant" peripheral vascular disease justifying an intervention. *See* Jeffrey L. Anderson, et al., "Management of Patients with Peripheral Artery Disease (Compilation of 2005 and 2011 ACCF/AHA Guideline Recommendations)," *Journal of the American College of Cardiology*, Vol. 61, No. 14 (Apr. 2013).

90. In most cases, "[e]ndovascular intervention is not indicated as prophylactic therapy in an asymptomatic patient with lower extremity PAD." *Id.* Thus, prior to performing an interventional procedure in the peripheral arteries, Medicare providers must assess the medical necessity of the intervention through a detailed evaluation, and thoroughly document the clinical indications necessitating the intervention, especially if the patient is otherwise asymptomatic. It is entirely possible for a patient to have one or more arteries that are completely blocked, yet still not need intervention because other vessels provide adequate blood to the surrounding tissue. Indeed, it is not uncommon for the body to actually develop new circulation pathways around a blockage, particularly if the blockage has been present for a long time.

91. Only after a Medicare provider has exhausted non-invasive tests and treatments—and after symptoms prove to be recurrent—should the provider consider performing invasive procedures on patients with severe PAD. "Because of the variability of individual . . . symptoms and variable impact of these symptoms on quality of life, patients should be selected for revascularization on the basis of the severity of their symptoms; a significant disability as assessed by the patient; failure of medical therapies; lack of significant comorbid conditions; vascular anatomy suitable for the planned revascularization; and a favorable risk/benefit ratio." Alan T. Hirsch, *et al.*, "ACC/AHA 2005 Practice Guidelines for the Management of Patients with Peripheral Arterial Disease," *Circulation* (2006).

22

92. Since at least August 13, 2012, Novitas, the MAC for Maryland and the District of Columbia, has maintained a Local Coverage Determination defining the requirements for coverage of stents in lower extremity arteries, which also contains guidance for PAD interventions in general. *See* Novitas LCD L32641, *Non-Coronary Vascular Stents* (effective August 13, 2012); LCD L35084, *Non-Coronary Vascular Stents* (effective November 1, 2015). Each of these LCDs state that the placement of a stent in a lower extremity artery "is covered only when all of the following conditions are met:"

- Angioplasty alone would not suffice.

- The patient has undergone prior thorough medical evaluation and management of symptoms for which PTA and stent are therapeutic.

- Surgical intervention would otherwise be considered as an alternative treatment for the patient.

- Condition(s) exists for which there is evidence of equal outcomes with renal artery intervention and medical therapy when compared with outcome of medical or surgical management.

93. Novitas LCD L32641 and L35084 also mandate that a Medicare provider must document the medical necessity of any stent by explaining why the initial angioplasty was ineffective or insufficient. Such reasons might include "30 percent or greater residual stenosis" or "recoil." The documentation provided to support the medical necessity of a stent must also demonstrate "an effort to establish a cause and effect relationship between the lesion to be treated and the presenting symptoms and/or other objective findings." Pursuant to these requirements, LCD L32641 and L35084 state the following limitations of coverage:

23

> The placement of a stent in a vessel for which there is no objective related symptom or limitation of function is considered to be preventive and, therefore, not covered by Medicare.
>
> Use of noncoronary vascular stents is covered only after the patient has had a thorough evaluation and treatment of symptoms and when PTA of the vessel alone has not, or is not expected to, sufficiently resolve the symptoms making surgery the likely alternative.

94. When a particular procedure is not covered by a LCD or other coverage determination, such as a National Coverage Determination made by CMS itself, then the provider must document medical necessity by stating why the particular procedure, *inter alia*, "meets, but does not exceed, the patient's medical needs." CMS Medicare Program Integrity Manual, Chapter 3.6.2.2 "Reasonable and Necessary Criteria."

95. Thus, prior to performing *any* interventional procedure in the peripheral arteries, Medicare providers must assess the medical necessity of the intervention through a detailed evaluation, and thoroughly document the clinical indications necessitating the intervention:

> each patient's condition and response to treatment must medically warrant the number of services reported for payment. Medicare requires the medical necessity for each service reported to be clearly demonstrated in the patient's medical record. Medicare expects that patients will not routinely require the maximum allowable number of services.

Novitas LCD L32641 and L35084. Likewise, when performing multiple interventions in the same area, a Medicare provider must specifically document the reason why the initial procedure was insufficient, as "services performed at an excessive frequency are not medically necessary." *Id.*

96. To justify diagnostic procedures such as ultrasounds and angiograms, Defendants were therefore required to document, at a minimum, objective information about the severity of a patient's symptoms. Absent symptoms, such tests are necessarily prophylactic and therefore not covered by Medicare.

97. Likewise, before performing invasive procedures like angioplasties and atherectomies, Defendants must objectively describe the severity of a patient's symptoms, the degree of any blockage, the possibility of other treatment, and the presence/absence of alternate flows that would mitigate the need for intervention. This documentation is essential, as the simple fact that an artery is blocked, even totally blocked, is not a sufficient indication for intervention. Absent symptoms, an invasive procedure is necessarily prophylactic and therefore not covered by Medicare. Even where symptoms are present, Defendants must still document why the intervention is necessary to relieve those symptoms, and explain why a non-invasive treatment would be ineffective.

## FACTUAL ALLEGATIONS

## VII. DEFENDANTS SUBMITTED FALSE CLAIMS FOR EXCESSIVE, MEDICALLY UNNECESSARY, AND/OR INADEQUATELY DOCUMENTED CARDIOVASCULAR PROCEDURES

98. Throughout the relevant period, Defendants engaged in a pattern and practice of seeing as many patients, scheduling as many appointments, ordering as many tests, performing as many cardiovascular interventions, implanting as many stents, and ultimately, collecting as many Medicare, Medicaid, and TRICARE payments as possible. As the majority of Defendants' patients had Medicare, Medicaid, or TRICARE as their primary health insurance, most of the unnecessary procedures that Defendants performed were paid for by the Government.

99. Defendants carried out this fraud by knowingly and willfully failing to properly document the medical necessity of the procedures they were performing, while falsely certifying to Novitas and CMS that they were maintaining records sufficient to permit an audit. The purpose of these woefully inadequate records was to conceal the fact that the majority of the vascular interventions performed by Defendants were either medically unnecessary, or exceeded

25

medical necessity. Defendants' conduct resulted in the submission of thousands of false claims to the Government, resulting in tens of millions of dollars in single damages to the public fisc.

100. Relator personally witnessed Defendants perform hundreds of angioplasties, atherectomies, and stentings on patients with only light to moderate stenosis, much less the 50-75% blockage necessary to justify an invasive intervention. Even when significant blockage was present, Relator witnessed Defendants perform invasive interventions when patients had no symptoms which, absent extraordinary circumstances, were *per se* medically unnecessary as intervention is considered preventative in an asymptomatic patient and therefore not covered by Medicare, Medicaid, or TRICARE. Relator also witnessed Defendants conceal these unnecessary procedures by exaggerating the severity of the patients' symptoms in their charts, thereby creating false records.

### A.    Failure to Document Medical Necessity

101. Novitas LCDs and CMS have set forth requirements for the documentation that a Medicare provider must create to justify the medical necessity of a procedure. As explained in national guidelines and Novitas LCD L32641 and L35084, because vascular interventions may be performed sequentially (e.g. angioplasty, followed by atherectomy, followed by stent placement), it is of central importance for the provider to document why a less-invasive or non-invasive procedure was insufficient. In other words, the provider must document why the procedures performed met, but did not exceed, the patient's medical needs. For the placement of stents, the provider must expressly document "an effort to establish a cause-and-effect relationship between the lesion to be treated and the presenting symptoms and/or other

26

objective findings" and provide documentation that, absent the stent, surgery is the likely alternative. Novitas LCD L32641 and L35084.

102. Defendants utterly failed to create the required documentation. In nearly every case, Defendants failed to provide any objective information about the severity of a patient's symptoms, the degree of any blockage, the possibility of other treatment, or the presence/absence of alternate flows that would mitigate the need for intervention. Defendants also made no effort to document non-invasive alternatives, such as treatment with medication, dietary changes, or exercise.

103. Patient charts also almost never contain direct evidence of the existence or severity of symptoms, such as signed medical histories or other forms filled out by a patient that directly describe his or her complaints. Instead, where documentation of medical necessity exists at all, Defendants state simply that the patient is "experiencing lifestyle-limiting claudication" and/or "rest pain" in one or both legs, with no further discussion of the symptoms. Defendants use these subjective terms to conceal the fact that these procedures are not medically necessary. Likewise, Defendants routinely avoid using objective language when describing the severity of symptoms, using ambiguous terms like "severe" or "critical" when describing the amount of occlusion, rather than an objective measure, *e.g.* "90% occluded."

104. This is not to say that some patients did not have serious symptoms. However, Relator observed that, in most cases, if a patient actually had objectively lifestyle-limiting symptoms, such as the inability to walk short distances, non-healing wounds, severe pain, and/or gangrene, Defendants would note these symptoms in the patient's chart. On the other hand, when patients had no symptoms, or when their symptoms were mild and/or ambiguous, then their charts would be correspondingly vague in order to conceal the lack of medical necessity.

27

105. When performing invasive procedures, Defendants also routinely failed to document the medical necessity of performing multiple procedures, such as placing a stent and/or performing an atherectomy following an angioplasty. Without a thorough discussion of why a patient required these additional procedures, it is impossible to know whether they were medically necessary.

106. Defendants also regularly relied on recordkeeping shortcuts, such as "copying and pasting" from other charts or templates. These records were almost always entered by nursing and/or support staff, rather than by physicians.

107. These shortcuts led to errors and omissions ranging from using incorrect gender pronouns to describing an entirely different procedure than the one billed to CMS (noting angiograms not performed or stating that the procedure was performed on a different limb or artery than the one billed), likely resulting from "copying and pasting" information from one chart to another. The charts also contain obvious dictation errors (such as stating "recall" where "recoil" is obviously meant), which could lead to confusion and potentially incorrect billing.

108. Likewise, Defendants' support staff regularly entered critical information that should have been gathered during an encounter, such as medical histories and symptoms, long after the encounter had taken place, making it impossible to verify that the information is in any way accurate, or that Defendants considered symptoms and other information when deciding whether to perform a procedure. This practice was made evident by form letters that Defendants sent out to patients after a procedure. These letters were automatically generated by Defendants' records system, populating various fields with whatever was written in the relevant section of the patient's chart. In many cases, even though a patient's chart now contains medical histories, physical exams, reviews of symptoms, etc., the letters sent to the

28

patient did not contain this information, indicating that the information was entered into the patient's chart after the letter was sent. In many cases, a patient's chart will indicate that an encounter was amended on a particular date, often months after the encounter took place, which strongly suggests that this is when the missing information was added.

109. Stents in particular lack proper documentation. Novitas' LCDs require Defendants to provide a detailed explanation of the medical necessity for placing a stent, including the degree of residual stenosis, recoil, or dissection. Defendants must also document that the patient's symptoms are sufficiently severe that, absent a stent, "surgical intervention would otherwise be considered as an alternative treatment for the patient." Novitas LCD L32641 and L35084. When Defendants provide any documentation of the medical necessity of a stent at all, that documentation almost always consists of less than five words, and never contains the detail required by Novitas' LCDs.

110. Proper documentation of medical necessity is required by Medicare, Medicaid, and TRICARE as a condition of payment. Defendants' routine failure to create such documentation, as well as their routine attempts to conceal the lack of medical necessity through the use of vague and subjective language, is a violation of the FCA. All such improperly documented claims are therefore false claims.

### B.    Excessive and Medically Unnecessary Procedures

111. Defendants used every possible excuse to perform as many invasive procedures as possible. Defendants put significant pressure on their staff to schedule as many interventions each day as possible, leading staff to refer to the office as an "assembly line that has to keep moving at full capacity."

112. Defendant's general scheme was to identify some symptom to justify an angiogram, examine all of the patient's lower peripheral arteries (even if the patient only had symptoms in one area) to identify a blockage, and then perform the maximum amount of intervention possible.

113. In order to create records that would support an angiogram and give them an excuse to hunt for blockages, Defendants routinely overestimated the findings of non-invasive tests like Dopplers, and described even the most mild symptoms as "lifestyle-limiting." Once the patient was on the operating table for an angiogram, Defendants then either overestimated the severity of a blockage, e.g. describing occlusions that blocked less than 50% of an artery as "critical," or ignored alternate flows that would make intervention in even a completely blocked artery unnecessary.

114. For this reason, virtually every patient that received an angiogram, especially those seen by Dr. Choudry, also received some combination of angioplasty, atherectomy, and stenting on the alleged blockage, often all three. These procedures would usually be performed at the same time as the angiogram, without additional discussion or consent from the patient.

115. Defendants justified their failure to obtain additional consent by having patients sign informed consent forms that listed every single procedure that Defendants performed, regardless of whether the patients were actually informed that they would receive a particular procedure. In most cases, there is no indication in a patient's chart that either a physician or nurse had explained the procedure, risks, or alternatives with the patient. Less often, a patient's chart will have no signed consent at all.

116. Defendants also routinely did unnecessary diagnostic tests in order to identify additional blockages for treatment. It was extremely common for a patient who complained of pain in only one limb to receive an angiogram of both limbs, plus an "aortogram" (angiogram of the

30

aorta and/or the surrounding cardiac arteries). If these unnecessary tests identified additional blockages, Defendants would either perform an intervention on the blockage immediately, or schedule the patient for another procedure, even if there was no plausible connection between the alleged blockage and any symptom.

117. Contrary to Novitas' LCDs, Defendants almost never considered, much less ordered, non-invasive treatments such as medication or changes in diet and exercise. Likewise, Defendants almost always failed to rule out alternative, non-vascular causes of patients' symptoms before performing invasive interventions. To the extent that Defendants peformed non-invasive testing at all, it was done only to justify invasive procedures.

118. Defendants also strove to perform additional interventions by engaging in "fishing" expeditions to find arteries to treat. Defendants scheduled patients who had received an invasive procedure for "follow-up" tests at regular intervals, generally every three months, six months, and 12 months. Defendants also cold-called former patients, some of whom Defendants had not seen for years, and invited them to return for a "checkup." Defendants scheduled these "follow-up" and "checkup" appointments regardless of whether the patient had any symptoms. In fact, most such patients were entirely asymptomatic, making the visit unnecessary. Nevertheless, despite the lack of any symptoms, Defendants performed invasive angiographies and other expensive procedures like ultrasounds. If these unnecessary tests identified additional blockages, the patients would either receive an intervention immediately, or be scheduled to return shortly to receive an intervention, regardless of whether the patient had any symptoms that warranted intervention.

119. Defendants' gross overutilization of Medicare services for this vulnerable population significantly deviated from what other cardiovascular specialists—and Medicare—consider reasonable and appropriate.

120. Each of the claims that Defendants presented for these excessive and unnecessary procedures was false.

## C.    Specific Examples of Medically Unnecessary and/or Inadequately Documented Procedures

121. The false claims set forth in this section of the Complaint are representative examples, drawn from a statistically-valid random sample of Defendants' Medicare, Medicaid, and TRICARE patients, of the false claims that Defendants submitted to the Government throughout the relevant period. Specifically, Relator has examined the complete medical and billing records of the 38 Medicare/Medicaid patients who visited Defendants' facility between June 1, 2015, and June 15, 2015, which have been produced to the Government. This date range was selected for two reasons: (1) because the encounters are old enough to capture records that would demonstrate both prior and subsequent procedures; and (2) because Defendants transitioned to a new record management and billing system in April/May 2015, making it much harder for Relator to obtain records from that time or before. The records were obtained in late February and early March 2016, making them current through that date.

122. For each procedure, a patient's chart should contain a nurse's note, which is supposed to be recorded contemporaneously during the procedure, and a procedure note, which is supposed to be recorded by the physician promptly after the procedure is complete. In his capacity as both nurse and manager, Relator personally observed that Dr. Choudry phrased his procedure notes with "buzzwords" like "lifestyle-limiting claudication" to ensure that the Government

would pay for the procedure. However, the contemporaneously-recorded nurse's notes often contradicted the procedure note and contained more accurate information. In fact, Dr. Choudry's procedure notes almost universally fail to discuss the degree of occlusion, severity of symptoms, or any other information that would adequately support the hundreds of invasive interventions that he performs each year.

123. While a final determination of the medical necessity for some of the procedures in this data set will likely require review by a medical expert, the following four patients were selected as examples because the issues and errors were so glaring as to be obvious even to the layperson. The unnecessary procedures performed on these four patients amount to more than $100,000 of false claims submitted to Medicare, Medicaid, and TRICARE.

## Patient "BS" (No. 30/532)[1]

124. Patient BS is a particularly egregious example of Defendants' inadequate documentation and performance of unnecessary procedures. Patient BS visited Defendants' facility for the first time on April 10, 2015. On that day, Patient BS underwent several invasive procedures, including a bilateral (both legs) angiogram, aortogram (angiogram of the aorta), angioplasty of the right superficial femoral artery and stenting of same. For the false claims presented for these services, Medicare paid Defendants $7,687.70.[2]

125. Patient BS' chart contains no signed informed consent for these procedures.

126. Dr. Choudry's procedure note for April 10, 2015 states that Patient BS had "extensive history of peripheral artery disease . . . has undergone endovascular procedure in the past . . . [and]

---

[1] Due to changes in record-keeping software, many patients have multiple identification numbers.

[2] This number (and the other amounts listed in the examples below) was obtained by adding up all of the payments made by Medicare for services performed on this date. However, the billing records appear to indicate that Defendants actually invoiced Medicare for the full face value of these services, a total of $17,313.10. As false claims liability flows from the claim, not the amount paid, it is therefore possible that Defendants' liability is significantly higher than the amount Medicare actually paid.

has been experiencing lifestyle-limiting claudication and rest pain on the right side." Dr. Choudry further stated that "Considering the patient's symptoms, the patient underwent a Doppler study, which was reported as abnormal. The patient came today for peripheral angiography and possible intervention."

127. This statement is deficient for multiple reasons. First and foremost, it does not contain enough information to demonstrate that any sort of intervention is medically necessary, nor is such information recorded elsewhere in Patient BS' chart. It does not describe the severity of claudication with any specificity (*e.g.* no objective measure of the pain or specific ways in which Patient BS' lifestyle is limited) and discusses no alternate causes of the pain or non-invasive alternative treatments. Patient BS' chart also contains no record of any prior interventions. Moreover, while the note states that a Doppler study was performed, Patient BS' chart does not contain any record of a Doppler study, nor did Defendants ever bill for one. Even if the Doppler was performed off-site or by another physician, Defendants must still document the results in order to rely upon them for medical necessity. The lack of documented, non-invasive testing makes the subsequent invasive procedures lack medical necessity.

128. Even if Dr. Choudry's description of Patient BS' symptoms is accepted at face value, it at most supports an angiogram of Patient BS' right leg, as the documented symptoms only concern that limb. The angiograms of Patient BS' left leg and aorta are therefore medically unnecessary on their face.

129. In support of the angioplasty and stenting of Patient BS' right superficial femoral artery, Dr. Choudry stated that, during the angiogram, he "noticed there was a critical disease of the right superficial femoral artery." He further stated that "this was a short segment, which

34

underwent PTA with a 5-0 balloon followed by short 6-0 x 20 stent with excellent results." This description does not demonstrate medical necessity of the angioplasty because it does not provide any estimate of the degree of blockage (minimum of 50-75% occluded typical for intervention), does not document the presence or absence of alternate flows around the alleged blockage (which would mitigate the need for intervention), and fails to provide any exploration of non-invasive alternatives. This description also blatantly violates Novitas LCD L32641 and L35084, because Dr. Choudry provided no explanation for why the angioplasty alone was not sufficient to open the allegedly blocked artery.

130. The nurse's note for Patient BS' April 10, 2015 visit further demonstrates the lack of adequate documentation, as the note contains no explanation for Patient BS' visit, nor any documentation of a patient interview or other discussion with the patient about his/her symptoms. In fact, the nurse's note was clearly created from a template and then never filled in, as it describes Patient BS only as "a ___ year-old [gender redacted] with extensive history of" and lists no symptoms, much less symptoms sufficient for an intervention. The note also describes the wrong procedure, stating that the catheter was inserted on the patient's right side and then advanced to the left, while the procedure note says the opposite, and does not mention the angioplasty or stenting. Finally, and perhaps most concerning, the nurse's note states that the angiogram showed that all arteries in both legs were "normal."

131. Patient BS' chart is a perfect example of Defendants' practice of "copying and pasting" information from templates or other charts, as it contains significant errors and numerous blanks that Defendants' staff apparently neglected to fill in, creating a contradictory record that is both dangerous for the patient (as inaccurate information could affect future medical decisions) and impossible to use to verify the accuracy of the bills presented to Medicare.

35

132. Between the inadequate documentation in the procedure note, the entirely missing and/or contradictory information in the nurse's note, and the lack of any other supporting information in Patient BS' records, there is no way to determine the existence or severity of Patient BS' symptoms or whether the procedures performed on April 10, 2015, were medically necessary. This lack of documentation supporting the medical necessity is a flagrant violation of Novitas' LCDs and Medicare's regulations, and deviates from the accepted practices for PAD treatment. By knowingly presenting a claim to the Government without creating such documentation, Defendants presented a false claim in violation of the FCA.

## Patient "GW" (No. 1632)

133. Patient GW has had numerous invasive procedures done by Defendants, dating back to at least October 2014. On May 27, 2015, despite the fact that the only documented symptom in Patient GW's chart was "rest pain most predominantly only the right lower extremity," Dr. Choudry performed a full, bilateral angiogram and aortogram. Lacking any chest or left leg symptoms, the angiogram was indicated for, at most, Patient GW's right leg. The angiogram of Patient GW's left leg and aorta were medically unnecessary. Nevertheless, Dr. Choudry allegedly observed occlusions in both superficial femoral arteries, and so scheduled Patient GW for interventions.

134. Patient GW returned to Defendants' facility on June 4, 2015, and underwent an angioplasty, atherectomy, and stenting of the right superficial femoral artery. Patient GW's chart, however, contains no documentation supporting the medical necessity of this procedure. There is no discussion of the severity of Patient GW's pain, and indeed the nurse's note states that Patient GW's "pain scale" prior to the intervention was zero. In fact, while Dr.

36

Choudry's procedure note states that Patient GW had "lifestyle limiting claudication and rest pain," the nurse's note (obtained by actually speaking with the patient) stated that Patient GW had only "right leg calf pain with activity" with no mention of rest pain or any other indication supporting the medical necessity of the intervention. Even if the angioplasty was indicated, Dr. Choudry provided no basis for performing the atherectomy, nor did he provide any documentation for the stent beyond vaguely noting "some re-collapse noticed," without providing any specifics. Dr. Choudry also provided no discussion of alternate causes, no discussion of non-invasive treatments, and in all other ways failed to provide the documentation required by CMS and Novitas, deviating from the accepted practices for PAD treatment. For the false claims presented for these services, Medicare paid Defendants $13,903.60.

135. On June 17, 2015, Patient GW underwent an angioplasty, atherectomy, and stenting of the *left* superficial femoral artery, despite the fact that Patient GW had neither complained of, nor displayed, any symptoms in that limb. Indeed, Dr. Choudry's procedure note contains no discussion of any symptoms at all in Patient GW's left leg, and the nurse's note mentions only "left leg mild swelling." This documentation provides no support for medical necessity whatsoever and completely fails to comply with the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,903.60.

136. Patient GW returned to Defendants' facility on November 9, 2015, likely as part of Defendants' "fishing" program. Dr. Choudry allegedly examined Patient GW on this day and, according to Dr. Choudry's procedure note, he supposedly observed that Patient GW had "lifestyle-limiting claudication" and "some rest pain on the right side." The nurse's note

contradicts this statement, noting that Patient GW only had "pain on rt leg with walking around the house" with no mention of rest pain. Patient GW's "pain scale" before the procedure again was zero.

137. Despite these ambiguous symptoms, Dr. Choudry again performed a bilateral angiogram and aortogram, then performed an angioplasty, atherectomy, and stenting of Patient GW's "critically diseased" *left* superficial femoral artery. The chart contains no hint that Patient GW experienced any left leg symptoms at all, nor does it explain why an intervention in this artery was necessary just five months after Dr. Choudry had performed the exact same procedure in the exact same place. This documentation provides no basis for medical necessity whatsoever and completely fails to comply with the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,973.10.

138. Patient GW returned for yet another intervention on November 20, 2015, this time receiving an angioplasty, atherectomy, and stenting of Patient GW's right superficial femoral artery. The nurse's note from this procedure indicates that Patient GW was experiencing "bilateral claudication. rt leg hurts more. Pain relieved with rest." The nurse's note again contradicts Dr. Choudry's procedure note, which states that Patient GW "was experiencing rest pain on the right side." Dr. Choudry again failed to explain why this intervention was necessary just six months after he had performed the exact same procedure. This documentation provides no basis for medical necessity whatsoever and completely fails to comply with the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For this wholly unnecessary procedure, Defendants billed Medicare $14,185.90.

139. The procedures that Dr. Choudry performed on Patient GW perfectly illustrate how Defendants use vague and subjective language to conceal a lack of medical necessity. An invasive intervention in an asymptomatic patient is presumptively preventative and therefore not covered by Medicare. Novitas LCD L32641 and L35084. In order to establish medical necessity for such an intervention, Defendants would have to document extraordinary circumstances, but Dr. Choudry documents none. Using subjective terms like "critically diseased" and "lifestyle-limiting claudication" is not adequate, as they provide no objective way to verify medical necessity, particularly when contradicted by a more specific nurse's note. Absent symptoms, the presence of even a completely blocked artery does not justify intervention, making every intervention that Dr. Choudry performed on Patient GW, except perhaps the first, lack medical necessity on its face. By knowingly presenting claims that lacked medical necessity to the Government, Defendants presented false claims in violation of the FCA.

## Patient "LH" (No. 2182)

140. Patient LH visited Defendants' facility on June 3, 2015. On this date, Dr. Choudry stated in his procedure note that Patient LH had "non-healing foot ulcers, predominantly on the toes and also a history of rest pain." The nurse's note, however, states that Patient LH had a single non-healing ulcer on the 3rd or 4th toe of the right foot, and notes no rest pain or other symptoms.

141. Despite having no medical basis for intervening anywhere except Patient LH's right leg, Dr. Choudry performed a bilateral angiogram and aortogram. This test supposedly revealed "critical disease of the distal left superficial femoral artery." Even though Patient LH's left leg had no symptoms, and Patient LH had come in that day because of non-healing wounds

39

on the right foot, Dr. Choudry then performed an angioplasty, atherectomy, and stenting of Patient LH's *left* superficial femoral artery. Absent symptoms, there was no medical necessity whatsoever for Dr. Choudry to perform an angiogram of Patient LH's left leg or aorta, nor was there any medical necessity for the subsequent interventions, which blatantly violated the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,903.60 and TRICARE paid $3,546.84.

142. Patient LH returned to Defendants' facility on June 11, 2015 for an intervention on the right distal superficial femoral artery. Given Patient LH's non-healing wounds, it is possible that this intervention was medically necessary. However, Dr. Choudry performed the maximum possible intervention, an angioplasty, followed by an "atherectomy", followed by a stent. Dr. Choudry did not provide any explanation of the medical necessity of the atherectomy, and he noted that the stent was necessary due to "dissection" (tearing of the artery wall) without providing any further explanation of the severity or need for an intervention. Indeed, it is entirely possible that the dissection was caused by the unnecessary atherectomy. Whether this procedure was medically necessary will require evaluation by a medical expert. For the potentially false claims Defendants presented for these services, Medicare paid $13,903.60 and TRICARE paid $3,546.84.

143. As part of Defendants' fishing program, Patient LH was called back to Defendants' facility and received an ultrasound/Doppler of both legs on September 23, 2015. While Medicare paid Defendants $213.96 for this procedure, no record of its results appears in Patient LH's chart.

144. Patient LH visited Defendants' facility again on September 29, 2015. In his procedure note, Dr. Choudry confirmed that Patient LH had returned as part of Defendants' fishing program, stating that Patient LH "was reevaluated for recurrence of symptoms and underwent Doppler studies." Dr. Choudry then stated that the September 23, 2015 Doppler "revealed a severe disease bilaterally on the superficial femoral arteries."

145. Based on this alleged finding, Dr. Choudry performed a new bilateral angiogram and aortogram. This procedure supposedly showed "evidence of disease" in Patient LH's left superficial femoral artery, and Dr. Choudry then performed an angioplasty, atherectomy and stenting in that artery. The complete lack of any discussion of symptoms is telling, as the nurse's note goes out of its way to state that "**PER PT DOES NOT HAVE ANY SYMPTOMS**" (caps in original, emphasis added). Absent symptoms, there was no medical necessity whatsoever for Dr. Choudry to perform an angiogram, much less any invasive interventions. Dr. Choudry's conduct blatantly violates the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,973.13 and TRICARE paid $3,564.58.

146. Patient LH came back to Defendants' facility for yet another procedure on October 13, 2015. Dr. Choudry stated in his procedure note that the September 29, 2015, angiogram of Patient LH's right superficial femoral artery had allegedly revealed "in-stent restenosis," despite noting no such thing anywhere in the documentation for the September 29 procedure. Nevertheless, Dr. Choudry went ahead with another angioplasty, atherectomy, and stenting of that artery. As with the prior procedure, the nurse's note again contradicts the medical necessity of this procedure, stating that Patient LH had "NO PAIN/WOUNDS/ULCERS ON

41

FEET." (caps in original). As with the prior procedure, Dr. Choudry's intervention in an asymptomatic patient violates the requirements set forth by CMS and Novitas and deviates from the accepted practices for PAD treatment. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,973.13 and TRICARE paid $3,564.58.

147. As above, an invasive intervention in an asymptomatic patient is presumptively preventative and therefore not covered by Medicare. Novitas LCD L32641 and L35084. In order to establish medical necessity for such an intervention, Defendants would have to document extraordinary circumstances – especially since Patient LH expressly denied having any symptoms. Absent symptoms, the presence of even a completely blocked artery does not justify intervention, as alternate flows frequently develop around the blockage to supply blood to the surrounding tissue. Likewise, repeated interventions on the same artery requires a thorough explanation of why the procedure is necessary. As such, each of the interventions described above, except perhaps the one on June 11, 2015, lacks medical necessity on its face. By knowingly presenting claims that lacked medical necessity to the Government, Defendants presented false claims in violation of the FCA.

## Patient "AD" (No. 2521)

148. Like Patient LH, Patient AD is a longtime patient of Dr. Choudry who has had numerous procedures in both legs stretching back to at least early 2014.

149. Patient AD visited Defendants' facility for Doppler tests on June 11 and September 10, 2015, likely as part of Defendants' fishing program. The September 10 test supposedly showed "severe stenosis of the left superficial femoral artery," so Defendants scheduled Patient AD for an intervention. Neither the June 11, nor September 10, test results are present in Patient AD's chart.

42

150. Patient AD came to Defendant's facility for an intervention on September 23, 2015. According to the nurse's note on that day, the only symptom that Patient AD reported was the "occasional cramp in both legs not very often." Nevertheless, despite performing no other tests, Dr. Choudry decided that this was claudication necessitating an invasive intervention. Dr. Choudry performed a bilateral angiogram and aortogram, and then proceeded to do an angioplasty, atherectomy, and stenting in Patient AD's left superficial femoral artery. Dr. Choudry had performed the same procedure on the same artery barely a year previously, on August 29, 2014. For the false claims Defendants presented for these wholly unnecessary services, Medicare paid $13,973.13.

151. Patient AD returned on October 1, 2015. Again, the nurse's note reports that Patient AD had "no symptoms or wounds on foot." Dr. Choudry's procedure note also lists no symptoms, stating only that Patient AD "came in today for treatment of critically diseased right superficial femoral artery" that was supposedly discovered during the angiogram on September 23, 2015. Despite the fact that Patient AD was entirely asymptomatic, Dr. Choudry again performed a full angioplasty, atherectomy, and stenting in Patient AD's right superficial femoral artery. Dr. Choudry had performed the same procedure on the same artery barely a year previously, on August 14, 2014. Defendants' billing record for this unnecessary procedure is particularly convoluted, but it appears that they triple-billed Medicare, causing Medicare to pay Defendants twice at $10,342.54, and once at $13,973.13.

152. As above, an invasive intervention in an asymptomatic patient is presumptively preventative and therefore not covered by Medicare. Novitas LCD L32641 and L35084. In order to establish medical necessity for such an intervention, Defendants would have to document extraordinary circumstances – especially since Patient AD expressly denied having any

43

symptoms. Absent symptoms, the presence of even a completely blocked artery does not justify intervention, making every intervention described above lack medical necessity on its face. By knowingly presenting a claims that lacked medical necessity to the Government, Defendants presented false claims in violation of the FCA.

## VII. DEFENDANTS KNOWINGLY AND WILLFULLY PAID KICKBACKS AND VIOLATED THE STARK LAW IN THE FORM OF WAIVED MEDICARE COPAYMENTS, FREE TRANSPORTATION, AND FREE ANKLE BRACHIAL INDEX TESTS

153. Defendants routinely and indiscriminately waived Medicare copayments, assuring that patients had no financial incentive to question the necessity of the excessive cardiovascular procedures to which Defendants subjected them.

154. Defendants failed to satisfy the conditions established by Medicare laws, regulations, and program instructions to support those copayment waivers.

155. Defendants, especially Dr. Choudry, regularly told patients that they would not have to pay for Defendants' services, and that insurance payments, including Medicare payments, would be treated as payment in full.

156. Many Medicare patients had various forms of co-insurance, including Medicaid and TRICARE, that would have paid most of the 20% of the allowed costs that Medicare did not cover. Defendants regularly waived the copays required by this co-insurance, even when those copays were extremely modest, on the order of thirty-five dollars or less. In fact, to the best of Relator's knowledge, the only time Defendants ever accepted money from patients was when the patient affirmatively insisted on paying them.

157. Similarly, Defendants' efforts to collect copayments, if undertaken at all, were token efforts. Defendants never contacted collection agencies to obtain overdue payments from patients. Instead, Defendants simply waited several months and then wrote-off any delinquent debts.

158. For example, Patient BS, *supra*, did not have co-insurance (co-insurance payer is stated as "patient") and so owed $1,961.14 for the portion of the April 10, 2015 procedure not paid by Medicare. Rather than collecting this amount, Defendants instead wrote it off as "bad debt" on November 11, 2015.

159. Patient GW, *supra*, had Aetna co-insurance, which required a modest copayment of $35 for surgical procedures like the ones on May 27, June 4, June 17, November 9, and November 20, 2015. Defendants did not collect these copayments, nor did they collect the even smaller copayments that Patient GW owed for office visits and tests. Instead, Defendants simply voided the debt.

160. Patient LH, *supra*, had TRICARE for co-insurance and was never charged a copayment at all.

161. Patient AD, *supra*, had Maryland Medicaid for co-insurance and, as of March 2016, owes approximately $4,076.97 in unpaid deductibles and copayments. Defendants have made no efforts to collect this outstanding debt, almost all of which is more than six months old.

162. In addition to failing to collect required copayments, Defendants also pay kickbacks in the form of free transportation to their patients. While he does not have direct access to the relevant records, Relator is aware that Defendants spend thousands of dollars each month providing free transportation to and from patients' homes, ensuring that patients have no financial incentive whatsoever to object to Defendants' unnecessary procedures.

163. Defendants also pay kickbacks to referring physicians, which is a violation of the Stark Law. Defendants employ technicians who use portable equipment to perform ankle brachial

45

indexes ("ABI") at the offices of other physicians.  An ABI is a simple test that measures the difference in blood pressure between a patient's ankle and thigh.  If the difference is significant, it could indicate a blockage.  Defendants' technicians will visit a particular physician's office on a regular schedule, one or twice a month, and the physician will have these technicians perform an ABI on any patients that the physician believes may have peripheral artery disease.  Defendants' technicians then provide the test results to Defendants, along with the patients' contact information, which was collected during the test.  Defendants evaluate the test results and independently contact any patients with a significant test result for further screening. Defendants interpret the results of these tests extremely broadly, such that nearly every patient who receives an ABI in this way is called in by Defendants for additional tests.

164. These ABIs are kickbacks because the physicians who provide the patients bill Medicare, Medicaid, and TRICARE for the procedure, as it was done in the physicians' offices, even though the service is actually being provided by Defendants without cost to the physician.

165. Several physicians have also formed "fair market value" agreements with Defendants, which require the physicians to pay Defendants a monthly fee for using Defendants' ABI equipment and Defendants' employees, which established a "financial relationship" for purposes of the Stark Law.  These payments, when they are made at all, are not related to the number of procedures that the physicians bill to the Government.  In most cases, this results in windfall profits for the physicians, which they obtain in exchange for the contact information of potential patients, *i.e.* referrals, to Defendants.

166. Defendants' ABI business also violates the Stark Law because it is effectively a self-referral. Patients are not told that the ABI performed in their own physician's office is actually

46

provided by Defendants, nor are patients told that the results of the ABI will be reported to Defendants. As such, Defendants are able to create the illusion of an independent referral, when in fact Defendants controlled every step of the process.

167. Violations of the Anti-Kickback Statute and Stark Law are *per se* violations of the FCA, making every claim that Defendants presented to the Government for patients who were self-referred or the product of kickbacks a false claim.

## VIII. DAMAGES TO THE UNITED STATES, MARYLAND, AND THE DISTRICT OF COLUMBIA

168. Defendants present more than $500,000 worth of claims to the Government each month, more than 95% of which is for the invasive surgical procedures described herein.

169. Based on his personal experience and expertise, Relator conservatively estimates that at least half of the invasive procedures performed by Defendants lack medical necessity entirely and should never have been performed because the patients in question did not have symptoms that justified intervention.

170. The majority of the other procedures performed by Defendants either exceeded medical necessity (*e.g.* by placing a stent when an angioplasty alone would have sufficed) or lacked adequate documentation to demonstrate medical necessity. All told, 75% or more of the invasive procedures Defendants performed, including virtually all of the procedures performed by Dr. Choudry, did not comply with the requirements for payment of Medicare, Medicaid, and TRICARE. All claims presented to the Government for such procedures were false claims.

171. Defendants have engaged in the fraudulent practices described herein since at least 2010. All told, Relator estimates that Defendants presented more than $25 million worth of false claims

47

during the relevant period, which the Government was not obligated to pay. Under the FCA, Defendants are therefore liable for not less than $75 million in treble damages.

172. Defendants are also liable for civil penalties of $5,500 to $11,000 for each false claim. Defendants present more than 100 claims to the Government each month, creating additional liability of not less than $39.6 million over the past six years.

173. Defendants total FCA liability therefore exceeds $100 million.

## COUNT I
### [31 U.S.C. § 3729(a)(1)(A) – Presenting False Claims]

174. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

175. As described in this Complaint, Defendants knowingly presented, and/or caused to be presented, thousands of false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and other health insurance programs funded or administered by the United States. These claims include, but are not limited to:

    a. Every claim for an unnecessary procedure;

    b. Every claim for a procedure that exceeded medical necessity;

    c. Every claim that Defendants did not support with adequate documentation of medical necessity;

    d. Every claim for which Defendants failed to charge and/or collect a co-pay required by Medicare, Medicaid, or other health insurance program funded or administered by the United States;

    e. Every claim that was the result of a self-referral through the use of an ankle-brachial index test; and

48

f. Every claim that otherwise contained a material misrepresentation.

176. By knowingly, willfully or recklessly presenting false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the Treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

177. By knowingly, willfully or recklessly causing others to present false claims for payment/reimbursement to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the Treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

178. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

179. Defendants are therefore jointly and severally liable to the United States for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

180. Defendants are also jointly and severally liable to the United States for a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

49

**COUNT II**
[31 U.S.C. § 3729(a)(1)(B) – Making Material False Statements and Certifications]

181. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

182. As described in this Complaint, Defendants knowingly made false statements and certifications, and/or caused others to make false statements and certifications, that were material to thousands of false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and other health insurance programs funded or administered by the United States. These knowing false statements and certifications include, but are not limited to:

    a. Certification on Defendants' application to participate in Medicare and Medicaid that it would comply with all applicable laws, regulations, and program instructions, the Stark Law and the Anti-Kickback Statute;

    b. Express statements on CMS Form 1500 as to the cost of their services in which they overstated the cost of these services by the amount of the inappropriately waived beneficiary copayments, therefore presenting inflated claims for payment of such services to Medicare, Medicaid, and other insurance programs funded or administered by the United States;

    c. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "true, accurate and complete;"

    d. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "medically indicated and necessary for the health of the patient;"

e.  Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants had "provided or will provide additional information required to allow the government to make an informed eligibility and payment decision;"

f.  Implied certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants possessed documentation to support the medical necessity of the claims presented; and

g.  Each record, such as medical charts, that Defendants created in order to justify each claim for procedures they knew to be unnecessary and/or not medically indicated.

183. Defendants knew, within the meaning of 31 U.S.C. § 3729(b)(1), that the implicit and explicit certifications it made were material to the United States' decision to pay each claim presented by Defendants.

184. By making material false statements and certifications, Defendants knowingly failed to comply with requirements upon which payment of these claims by the United States was contingent.

185. By knowingly, willfully or recklessly making false statements and certifications material to the United States' decision to pay on false claims presented to Medicare, Medicaid, and other insurance programs funded or administered by the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the Treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.  In carrying out these wrongful acts, Defendants

have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

186. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

187. Defendants are therefore jointly and severally liable to the United States for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

188. Defendants are also jointly and severally liable to the United States for a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

### COUNT III
[31 U.S.C. § 3729(a)(1)(C) – Conspiracy]

189. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

190. Defendants conspired to commit the fraudulent acts set forth in Counts I and II by knowingly agreeing amongst themselves to commit those acts and then engaging in conduct, such as performing unnecessary procedures or creating false medical records, which furthered this conspiracy.

191. By conspiring to present false claims to the United States, and to make false statements and create false records, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the Treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and

pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

192. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

193. Defendants are therefore jointly and severally liable to the United States for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

194. Defendants are also jointly and severally liable to the United States for a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

## COUNT IV
[Md. Code Ann. Health-Gen. § 2-602(a)(1) – Presenting False Claims]

195. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

196. As described in this Complaint, Defendants knowingly presented, and/or caused to be presented, thousands of false and/or fraudulent claims for payment or approval to Maryland Medicaid programs.  These claims include, but are not limited to:

    a.  Every claim for an unnecessary procedure;

    b.  Every claim for a procedure that exceeded medical necessity;

    c.  Every claim that Defendants did not support with adequate documentation of medical necessity;

    d.  Every claim for which Defendants failed to charge and/or collect a co-pay required by Maryland Medicaid programs;

     e.  Every claim that was the result of a self-referral through the use of an ankle-brachial index test; and

     f.  Every claim that otherwise contained a material misrepresentation.

197. By knowingly, willfully or recklessly presenting false claims for payment to the State of Maryland, Defendants have defrauded Maryland in contravention of the Maryland False Health Care Claim Act of 2010, Md. Code Ann. Health-Gen. § 2-602(a)(1), to the damage of the Treasury of Maryland, by causing Maryland to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to Maryland's decision to pay these false claims.

198. By knowingly, willfully or recklessly causing others to present false claims for payment to the State of Maryland, Defendants have defrauded Maryland in contravention of the Maryland False Health Care Claim Act of 2010, Md. Code Ann. Health-Gen. § 2-602(a)(1), to the damage of the Treasury of Maryland, by causing Maryland to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to Maryland's decision to pay these false claims.

199. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the State of Maryland has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

200. Defendants are therefore jointly and severally liable to the State of Maryland for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

201. Defendants are also jointly and severally liable to the State of Maryland for a civil fine under the Maryland False Health Care Claim Act of 2010 of not more than ten thousand dollars ($10,000) for each false claim.

### COUNT V
[Md. Code Ann. Health-Gen. § 2-602(a)(2) – Making Material False Statements and Certifications]

202. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

203. As described in this Complaint, Defendants knowingly made false statements and certifications, and/or caused others to make false statements and certifications, that were material to thousands of false and/or fraudulent claims for payment or approval to Maryland Medicaid programs. These knowing false statements and certifications include, but are not limited to:

    a. Certification on Defendants' application to participate in Maryland Medicare programs that it would comply with all applicable laws, regulations, and program instructions, the Stark Law and the Anti-Kickback Statute;

    b. Express statements on CMS Form 1500 as to the cost of their services in which they overstated the cost of these services by the amount of the inappropriately waived beneficiary copayments, therefore presenting inflated claims to Medicaid programs for payment of such services;

    c. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "true, accurate and complete;"

d.  Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "medically indicated and necessary for the health of the patient;"

e.  Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants had "provided or will provide additional information required to allow the government to make an informed eligibility and payment decision;"

f.  Implied certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants possessed documentation to support the medical necessity of the claims presented; and

g.  Each record, such as medical charts, that Defendants created in order to justify each claim for procedures they knew to be unnecessary and/or not medically indicated.

204.  Defendants knew, within the meaning of Md. Code Ann. Health-Gen. § 2-601(f)(1), that the implicit and explicit certifications it made were material to the State of Maryland's decision to pay each claim presented by Defendants.

205.  By making material false statements and certifications, Defendants knowingly failed to comply with requirements upon which payment of these claims by the State of Maryland was contingent.

206.  By knowingly, willfully or recklessly making false statements and certifications material to the State of Maryland's decision to pay on false claims presented to Maryland Medicaid programs, Defendants have defrauded Maryland in contravention of the Maryland False

Health Care Claim Act of 2010, Md. Code Ann. Health-Gen. § 2-602(a)(2), to the damage of the Treasury of Maryland, by causing Maryland to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to Maryland's decision to pay these false claims.

207. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the State of Maryland has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

208. Defendants are therefore jointly and severally liable to the State of Maryland for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

209. Defendants are also jointly and severally liable to the State of Maryland for a civil fine under the Maryland False Health Care Claim Act of 2010 of not more than ten thousand dollars ($10,000) for each false claim.

## COUNT VI
[Md. Code Ann. Health-Gen. § 2-602(a)(3) – Conspiracy]

210. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

211. Defendants conspired to commit the fraudulent acts set forth in Counts IV and V by knowingly agreeing amongst themselves to commit those acts and then engaging in conduct, such as performing unnecessary procedures or creating false medical records, which furthered this conspiracy.

212. By conspiring to present false claims to the State of Maryland, and to make false statements and create false records, Defendants have defrauded Maryland in contravention of the

Maryland False Health Care Claim Act of 2010, Md. Code Ann. Health-Gen. § 2-602(a)(3),
to the damage of the Treasury of Maryland, by causing Maryland to pay out money that it
was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a
protracted course and pattern of fraudulent conduct that was material to Maryland's decision
to pay these false claims.

213. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern
of fraudulent conduct, the State of Maryland has paid directly or indirectly thousands of false
claims that it would not otherwise have paid.

214. Defendants are therefore jointly and severally liable to the State of Maryland for damages that
include, but are not limited to, three times the full value of all such fraudulent claims.

215. Defendants are also jointly and severally liable to the State of Maryland for a civil fine under
the Maryland False Health Care Claim Act of 2010 of not more than ten thousand dollars
($10,000) for each false claim.

## COUNT VII
[D.C. Code § 2-381.02(a)(1) – Presenting False Claims]

216. The allegations contained in the above paragraphs are hereby realleged as set forth fully
above.

217. As described in this Complaint, Defendants knowingly presented, and/or caused to be
presented, thousands of false and/or fraudulent claims for payment or approval to District of
Columbia Medicaid programs. These claims include, but are not limited to:

    a. Every claim for an unnecessary procedure;

    b. Every claim for a procedure that exceeded medical necessity;

    c.  Every claim that Defendants did not support with adequate documentation of medical necessity;

    d.  Every claim for which Defendants failed to charge and/or collect a co-pay required by District of Columbia Medicaid programs;

    e.  Every claim that was the result of a self-referral through the use of an ankle-brachial index test; and

    f.  Every claim that otherwise contained a material misrepresentation.

218. By knowingly, willfully or recklessly presenting false claims for payment to the State of District of Columbia, Defendants have defrauded the District of Columbia in contravention of the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(1), to the damage of the Treasury of the District of Columbia, by causing the District of Columbia to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the District of Columbia's decision to pay these false claims.

219. By knowingly, willfully or recklessly causing others to present false claims for payment to the State of the District of Columbia, Defendants have defrauded The District of Columbia in contravention of the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(1), to the damage of the Treasury of the District of Columbia, by causing the District of Columbia to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the District of Columbia's decision to pay these false claims.

220. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the District of Columbia has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

221. Defendants are therefore jointly and severally liable to the District of Columbia for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

222. Defendants are also jointly and severally liable to the District of Columbia for a civil fine under the District of Columbia False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

## COUNT VIII

[D.C. Code § 2-381.02(a)(2) – Making Material False Statements and Certifications]

223. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

224. As described in this Complaint, Defendants knowingly made false statements and certifications, and/or caused others to make false statements and certifications, that were material to thousands of false and/or fraudulent claims for payment or approval to District of Columbia Medicaid programs. These knowing false statements and certifications include, but are not limited to:

   a. Certification on Defendants' application to participate in District of Columbia Medicare programs that it would comply with all applicable laws, regulations, and program instructions, the Stark Law and the Anti-Kickback Statute;

   b. Express statements on CMS Form 1500 as to the cost of their services in which they overstated the cost of these services by the amount of the inappropriately

waived beneficiary copayments, therefore presenting inflated claims to Medicaid programs for payment of such services;

c. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "true, accurate and complete;"

d. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the claims presented were "medically indicated and necessary for the health of the patient;"

e. Express certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants had "provided or will provide additional information required to allow the government to make an informed eligibility and payment decision;"

f. Implied certification on each CMS Form 1500 Health Insurance Claim Form, and/or other documentation presented as part of each claim for payment, that the Defendants possessed documentation to support the medical necessity of the claims presented; and

g. Each record, such as medical charts, that Defendants created in order to justify each claim for procedures they knew to be unnecessary and/or not medically indicated.

225. Defendants knew, within the meaning of D.C. Code § 2-381.01(7), that the implicit and explicit certifications it made were material to the District of Columbia's decision to pay each claim presented by Defendants.

226. By making material false statements and certifications, Defendants knowingly failed to comply with requirements upon which payment of these claims by the District of Columbia was contingent.

227. By knowingly, willfully or recklessly making false statements and certifications material to the State of The District of Columbia's decision to pay on false claims presented to District of Columbia Medicaid programs, Defendants have defrauded the District of Columbia in contravention of the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(2), to the damage of the Treasury of the District of Columbia, by causing the District of Columbia to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the District of Columbia's decision to pay these false claims.

228. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the District of Columbia has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

229. Defendants are therefore jointly and severally liable to the District of Columbia for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

230. Defendants are also jointly and severally liable to the District of Columbia for a civil fine under the District of Columbia False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

### COUNT IX
[D.C. Code § 2-381.02(a)(3) – Conspiracy]

231. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

232. Defendants conspired to commit the fraudulent acts set forth in Counts VII and VIII by knowingly agreeing amongst themselves to commit those acts and then engaging in conduct, such as performing unnecessary procedures or creating false medical records, which furthered this conspiracy.

233. By conspiring to present false claims to the District of Columbia, and to make false statements and create false records, Defendants have defrauded the District of Columbia in contravention of the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(3), to the damage of the Treasury of the District of Columbia, by causing the District of Columbia to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the District of Columbia's decision to pay these false claims.

234. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the District of Columbia has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

235. Defendants are therefore jointly and severally liable to the District of Columbia for damages that include, but are not limited to, three times the full value of all such fraudulent claims.

236. Defendants are also jointly and severally liable to the District of Columbia for a civil fine under the District of Columbia False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) for each false claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of the United States of America, the State of Maryland, the District of Columbia, and himself, pray as follows:

63

a.  That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages sustained by the United States as a result of the fraudulent conduct described in this Complaint, including but not limited to the full value of all false claims presented by Defendants to Medicare, Medicaid and any other insurance program administered or funded by the United States;

b.  That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages sustained the State of Maryland as a result of the fraudulent conduct described in this Complaint;

c.  That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages sustained the District of Columbia as a result of the fraudulent conduct described in this Complaint;

d.  That because all Defendants are responsible for submitting false claims, using false records or statements to get such claims paid, and using false statements to avoid and conceal their obligation to repay funds they wrongfully obtained, all Defendants are jointly and severally liable for the full amount of damages and civil or criminal penalties awarded in this case;

e.  That each and every Defendant be held jointly and severally liable for a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim described herein and presented to, or approved by, the United States or private insurance companies by any person;

f.  That the Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the United States from a judgment in this action, settlement of the claims, and/or any

alternative remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3730(c)(5), (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

g.      That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 25% of the proceeds awarded to the State of Maryland from a judgment in this action, settlement of the claims, and/or any alternative remedies, including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to third parties;

h.      That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the District of Columbia from a judgment in this action, settlement of the claims, and/or any alternative remedies, including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to third parties;

i.      That Plaintiff-Relator, the United States, the State Maryland, and the District of Columbia be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

j.      That Plaintiff-Relator, the United States, the State Maryland, and the District of Columbia be awarded pre-judgment interest on all monies awarded; and

k.      That Plaintiff-Relator be granted all other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and understanding.

_____                    Nov 7, 2016
Steven Pringle                               Date


Respectfully submitted,

_____
Joseph V. Kaplan
Erik D. Snyder (*bar admission pending*)
Passman & Kaplan, P.C.
1828 L Street, N.W.
Suite 600
Washington, DC  20036
TEL:  202-789-0100, Ext. 105, 113
FAX:  202-789-0101

Attorneys for Relator

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this 21st day of November, 2016, he caused the

foregoing Complaint and Motion to File Under Seal to be served via U.S. Certified Mail upon

the following:

ATTORNEY GENERAL OF THE UNITED STATES
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, DC 20530

ATTORNEY GENERAL FOR THE STATE OF MARYLAND
200 St. Paul Place
Baltimore, MD 21022

ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
441 4th Street NW, Suite 1060 N
Washington, DC 20001

Erik D. Snyder